# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>v.<br><br>WILLIAM JOSEPH WATSON,<br><br>                Defendant. | Case No.: 13-cr-2988-L<br><br>**ORDER:**<br><br>**(1) DENYING MOTION TO VACATE, SET ASIDE, or CORRECT SENTENCE UNDER 28 U.S.C. 2255, and**<br><br>**(2) DENYING CERTIFICATE OF APPEALABILITY** |

      Petitioner, William Joseph Watson ("Petitioner") filed a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his sentence. Respondent filed a Response and Opposition to the Motion, and Petitioner has filed a Supplemental Traverse in response. The Court has reviewed the record, the submissions of the parties, and the supporting exhibits. For the reasons set forth below, the Court **DENIES** Petitioner's Motion without prejudice.

//

## I. FACTUAL BACKGROUND

Petitioner Watson was a licensed Doctor of Osteopath (D.O.) in the State of California and was also registered as a physician with the Drug Enforcement Administration (DEA). These designations allowed him to prescribe controlled substances to patients including Oxycodone, Hydrocodone, and Xanax. The prescription of controlled substances for pain is subject to guidelines promulgated in a policy statement enacted by the Medical Board of California. Included in the guidelines is the requirement that a prescribing physician take a medical history and conduct a physical exam for patients, which includes substance abuse history. Physicians are directed to develop a treatment plan and keep patient records. The State of California also maintains a Controlled Substance Utilization Review and Evaluation System (CURES) to monitor all Schedule I through IV, and some Schedule V, controlled substance prescriptions dispensed by pharmacies in California. CURES is managed by the California Department of Justice, and is used by law enforcement and regulatory agencies to monitor the patterns and practices of physicians prescribing controlled substances in California. When law enforcement reviewed Petitioner's CURES reports, they discovered that he had been prescribing large quantities of controlled substances. Petitioner was aware that some of the individuals to whom he prescribed Oxycodone were using the prescriptions to obtain and sell Oxycodone to various customers. During the time period in question, Petitioner wrote prescriptions for the distribution and dispensing of Oxycodone in an amount equal to or exceeding 105,000 milligrams of actual Oxycodone without any legitimate medical purpose and was compensated for doing so by those to whom he provided or agreed to provide the prescriptions.

## II. PROCEDURAL BACKGROUND

Petitioner was charged in a 41-count indictment on August 13, 2013, with: Count 1, Conspiracy to Distribute and Dispense Oxycodone without a Legitimate Prescription, in violation of 21 U.S.C. § 841 and 846; and Counts 2 through 41 with Distributing and

Dispensing Oxycodone Without Legitimate Medical Purposes, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C)) and 18 U.S.C. § 2.

On August 26, 2016, Petitioner pled guilty to Count 1 of the indictment pursuant to a plea agreement.  Under the terms of the plea agreement, Petitioner agreed to waive any right to appeal or to collaterally attack his conviction and sentence, provided the court did not impose a custodial sentence greater than the high end of the guidelines range recommended by the Government.  *See*, Plea Agreement, 8-9 [ECF NO. 55.] In exchange, the Government agreed to recommend a base offense level of 30, a 2-level safety valve departure pursuant to United States Sentencing Guidelines ("USSG") §§ 2D1.1(b)(6) and 5C1.2 if applicable, a 2-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1, along with a 2 level increase for abuse of position under USSG § 3B1.3.  *Id.* at 6.

At sentencing, the prosecution requested a sixty-three month sentence, the low-end of the Guideline Range. On December 8, 2014, Petitioner was sentenced by this Court to 57 months in the custody of the Bureau of Prisons, and three years supervised release. [ECF NO. 65.]

### III.  DISCUSSION

#### A. Sentencing Error

Petitioner argues that his Sixth Amendment due process rights were violated when the prosecutor wrongly claimed that the drugs prescribed by Petitioner caused Gabriel Nussbaum's death of a drug overdose. (Mot. 2). Although the prosecutor knew that Nussbaum's autopsy report showed no opiates in his system, he argued that "it's by the grace of God that [Petitioner] isn't looking at manslaughter charges" which would carry a twenty year minimum mandatory sentence under 21 U.S.C. § 841(b)(1)(C). (*Id.* at 3; Traverse at 3). As a result of the prosecutor's presentation of false and inflammatory evidence, Petitioner claims his due process rights were violated under *Alcorta v. State of Texas*, 355 U.S. 28 (1957), *United States v. Hahn*, 359 F.3d 1315 (10th Cir. 2004) and

3

*Napue v. Illinois,* 369 U.S. 264, 269 (1959). (Supp Traverse 3-4). Petitioner contends that the prosecutor's statements caused the Court to believe the sentencing recommendation in the plea agreement was sufficiently lenient in light of the seriousness of the offense, and resulted in a higher sentence. (*Id.*) Although Petitioner agreed to waive his appeal and collateral attack rights, he did not believe he was also waiving his right to challenge prosecutorial misconduct that occurred during sentencing proceedings, therefore he contends his waiver of appeal and collateral attack were invalidated by the Government's misconduct. (*Id.*)

The Government counters that Petitioner waived his right to collaterally challenge his sentence via a section 2255 Motion when he knowingly and voluntarily waived that right in his plea agreement. (Opposition at 9). By the terms of that agreement, the United States and Petitioner contemplated that he would not file any collateral attacks on his conviction and sentence if the United States abided by its promise to recommend a low-end sentence, which the Government did. (*Id.* at 10). Petitioner has not argued that his waiver of appeal and collateral attack was not knowingly and voluntarily made, and the record supports this claim. (*Id.*) For this reason, the Government claims the Court should enforce Petitioner's waiver and dismiss the petition. (*Id.* at 11).

Plea agreements are contractual in nature and the plain language of the agreement will generally be enforced if it is clear and unambiguous on its face. *United States v. Jeronimo*, 398 F. 3d 1149, 1153 (9th Cir. 2005) overruled on other grounds by *United States v. Castillo*, 496 F.3d 947, 957 (9th Cir.2007) (en banc). In contrast, the right to collaterally attack a sentence under 28 U.S.C. § 2255 is statutory in nature, and a defendant may therefore waive the right to file a § 2255 petition. *See, e.g.*, *United States v. Abarca*, 985 F.2d 1012, 1014 (9th Cir. 1993) (by entering plea agreement waiving right to appeal sentencing issues, defendant relinquished his right to seek collateral relief from his sentence on the ground of newly discovered exculpatory evidence*).* An appellate rights waiver "is enforceable if (1) the language of the waiver encompasses his right to appeal on the grounds raised, and (2) the waiver is knowingly and voluntarily made."

*Jeronimo*, 398 F.3d at 1153. To determine whether a guilty plea, and plea agreement, were knowing and voluntary, the court looks to the Rule 11 plea colloquy. *Jeronimo*, 398 F.3d at 1157 n. 5. Such a waiver might also be ineffective where the sentence imposed is not in accordance with the negotiated agreement, or if the sentence imposed violates the law. *United States v. Littlefield,* 105 F.3d 527, 528 (9th Cir. 1996*).* Finally, a waiver may not "categorically foreclose" defendants from bringing § 2255 proceedings involving ineffective assistance of counsel or involuntariness of waiver. *Abarca,* 985 F.2d at 1014*; United States v. Pruitt,* 32 F.3d 431, 433 (9th Cir. 1992*).*

Here, the prosecutor's remarks regarding Nussbaum's death did not violate Petitioner's due process rights and invalidate his appellate and collateral attack waiver. During sentencing proceedings, defense counsel acknowledged that Petitioner had overprescribed drugs, but recommended a sentence of 5 months incarceration and 5 months home confinement, with the ability to work or do volunteer service outside the home. (Sentencing Transcript at 4 [ECF NO. 67]). Counsel argued that Petitioner was a gifted healer who would better serve society by being able to help individuals as a massage therapist. (*Id.*)

To counter this mitigation evidence, the prosecutor emphasized that Petitioner had been overprescribing "tens of thousands of pills" which had significant consequences. (*Id.*) To illustrate this point, the prosecutor described a few of Petitioner's clients including:

> Gabriel Nussbaum, who was getting 25 Oxycodones a day by this defendant, written in his name and his mother's name. And when that wasn't enough, he switched over to Ambien and Soma, until Gabriel Nussbaum, at 24 years old, was found dead of an overdose from the pills this individual had prescribed. It's by the grace of God that he isn't looking at manslaughter charges because he was overdosing on Schedule IV substances that aren't covered by the code.

*(Id.* at 10).

Defense counsel responded by stating he was concerned about Nussbaum and did extensive investigation into that situation, but his conclusion was

Nussbaum had a medical condition which caused a lot of pain and for which he had been prescribed many of the same drugs by multiple doctors, including Petitioner. (*Id*. at 13). The Court considered this and other mitigation evidence provided by Petitioner, including a medical report which diagnosed Petitioner with significant mental health issues. (*Id*.) After considering this evidence, the Court reduced his sentence by 1 point, resulting in a guideline range of 57 to 71 months. (Sentencing Transcript at 19 [ECF NO. 67]). Rather than sentencing Petitioner to 63 months as requested by the Government, the Court sentenced him to the low-end of the amended guideline range of 57 months. (*Id*.)

The Court specifically addressed allegations made by the Government concerning Nussbaum's death, stating, "I am not here to decide whether your drugs caused the specific death of the one individual or the other, but I have to believe it added to the cause, and as a result, that's really just as serious." (*Id*. at 19). While it was not the sentence requested by Petitioner, it was evident that the Court did not make a determination about Petitioner's responsibility for Nussbaum's death when pronouncing Petitioner's sentence, although it was weighed and considered.

Petitioner would like the Court to believe that the prosecutor's statements violated his due process rights as defined in *Napue* and its progeny. The Court does not agree. Under *Napue*, "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. at 269. To prevail on a *Napue* claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material. *See Napue*, 360 U.S. at 269-71. Evidence is material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). In *Hayes*, the Ninth Circuit determined that the prosecutor's knowing presentation of false evidence and failure to correct the record during trial violated the defendant's

due process rights, noting that "[t]here is nothing redemptive about the sovereign's conspiring to deceive a judge and jury to obtain a tainted conviction." 399 F.3d at 981. Similarly, in *Alcorta*, the defendant's due process rights were violated during trial when the prosecutor told a key witness not to volunteer damaging impeachment evidence of which the prosecutor was aware and sat by while the witness committed perjury, leading to a reversal. 355 U.S. 28, 30-32 (1957).

Unlike *Napue*, this case does not concern a conviction obtained through the use of knowingly false evidence, but rather, the impact of allegedly false and misleading evidence during sentencing proceedings. As indicated in *Hayes*, it is unquestionable that the utilization of false evidence to obtain a conviction invokes grave due process concerns, however the posture of a defendant who has pled guilty pursuant to a negotiated plea agreement with the advice of counsel and agrees that his waiver of appellate rights was knowingly and voluntarily given is in a much different position. *See Hayes*, 399 F.3d at 978; *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) ("safeguarding the liberty of the citizen against deprivation through the action of the state, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions.")

Even if the prosecutor's statement concerning Nussbaum was in whole or part factually incorrect, the evidence did not adversely affect Petitioner's sentence because Petitioner's sentence fell below the anticipated plea agreement range. Such a sentence cannot constitute a miscarriage of justice that "seriously affects the fairness, integrity, or public reputation of judicial proceedings" as defined in *Hahn*, 359 F.3d at 1327.

Finally, there is no merit to Petitioner's argument that his waiver is invalid on the basis that he did not knowingly and voluntarily agree to allow the Government to present false evidence during sentencing proceedings. Petitioner contends that a defendant is entitled to know the entire scope of the rights he is forfeiting when he agrees to waive his collateral attack rights, which did not happen here. However, Petitioner's only authority for this proposition is the dissent in *Jeronimo*, 398 F. 3d at 1158, which the Court does

not find persuasive. Instead, the Court finds that Petitioner was properly advised of the rights he was foregoing when he executed the plea agreement, including the waiver of his right to appeal or collaterally attack his sentence. During the plea colloquy, the Court confirmed that Petitioner and his attorney had "gone over each and every page of the agreement" and that he understood the terms and conditions of the agreement, asking:

> THE COURT: Do you also understand if I pronounce sentence in accordance with the terms of the agreement, you have waived your right to appeal the sentence or at a later date, collaterally attack the sentence. Is that clear?
> MR. WATSON: Yes.

(Change of Plea Transcript at 6-7 [ECF NO 75.])

Because Petitioner agreed that he understood the rights he was waiving, the Court finds his waiver valid and enforceable. *Jeronimo*, 398 F.3d at 1157 n. 5 (A waiver is considered knowing and voluntary where the plea colloquy satisfies Rule 11, and the record reveals no misrepresentation or gross mischaracterization by counsel that tainted the plea.)

For these reasons, the Court finds the prosecutor's statements did not violate Petitioner's due process rights during sentencing proceedings.

### B. Ineffective Assistance of Counsel at Sentencing

The right to effective assistance of counsel under the Sixth Amendment exists during sentencing proceedings. *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). To establish ineffective assistance of counsel, a petitioner must prove by a preponderance of the evidence that: (1) the assistance provided by counsel fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. To satisfy the deficiency prong of the *Strickland* test, the Petitioner must show that his counsel's performance was not "within the range of competence demanded of attorneys in criminal cases." *Id*. at 687 (quoting in part *McMahan v. Richardson*, 397 U.S. 759,

771 (1970).  In considering this issue, there pis a "strong presumption that counsel's conduct falls within a wide range of professional assistance."  *Strickland*, 466 U.S. at 689.  Moreover, courts typically find that post hoc complaints about the strategy or tactics that defense counsel employed are insufficient to satisfy the first prong of *Strickland*.  See, e.g., *United States v. Simmons*, 923 F.2d 934, 956 (2d. Cir. 1991) (holding that appellant's displeasure with strategy employed by trial counsel was insufficient to establish ineffectiveness).

Petitioner contends his constitutional right to effective assistance of counsel was violated by defense counsel's failure to thoroughly research and present evidence to counter the Government's introduction of inflammatory evidence regarding Nussbaum's death.  (Mot. 2-4).  Counsel's failure to introduce Nussbaum's autopsy and toxicology reports constituted deficient performance because, without the reports, it made it appear that the plea agreement was fair by limiting the Government's sentencing recommendation to a sixty-three month sentence for conduct which otherwise would expose Petitioner to a mandatory prison sentence of twenty years.  (Supp. Traverse at 6). Petitioner claims he was prejudiced by receiving a much higher sentence as a result of counsel's deficient performance.  (*Id.*)

In response, the Government argues that Petitioner was represented by experienced counsel who raised and advocated mitigating evidence with enough force to convince the Court to depart downward from the agreed upon range in the plea agreement.  (Oppo. 12).

During the sentencing hearing, defense counsel argued for a minimal amount of custody by illustrating how Petitioner had been a successful medical professional who helped many people with pain management during the course of his practice, prior to his mental health issues deteriorating.  (Sent. Tr. 13).  Defense counsel acknowledged that Petitioner was prescribing large amounts of drugs to young people, but argued that Petitioner was manipulated by some of these addicts because he was a naïve, kind-hearted person. (*Id.*)  Counsel stated that Petitioner knew what he did was wrong, that he

accepted responsibility, and understood he was going to be punished. (*Id.*) With regard to the statements about Nussbaum's death, defense counsel said:

> I am concerned about the statements he [ASUA] made about Mr. Nussbaum. Of course, I was concerned about Nussbaum and did a lot of investigation into the situation. Mr. Nussbaum had suffered from a syndrome called Ehlers-Danlos syndrome, which causes an individual to have a lot of pain. He had been treating with many physicians and was basically receiving the same drugs that Dr. Watson was prescribing for him.
>
> . . .
>
> I have reviewed the autopsy report. There was an accidental overdose of drugs. Nussbaum was receiving drugs from lots of sources. So there seems to be an implication that they can't prosecute Dr. Watson for this, and the reason they shouldn't be able to prosecute was that the family just doesn't feel that he is responsible for it, for Gabriel Nussbaum's death.

(*Id.* 13-14).

Contrary to Petitioner's claim, defense counsel conducted investigation into Nussbaum's death, and determined it was an accidental overdose with no clear causation attributable to Petitioner. *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003) (duty to conduct investigation into mitigating evidence exists during sentencing). Counsel referred to Nussbaum's autopsy report in response to the allegations made by the Government and noted that Petitioner was not being prosecuted for Nussbaum's death, which contradicted the implication made by the prosecutor that Petitioner was lucky he wasn't facing manslaughter charges. Far from being deficient performance, defense counsel's conduct was "within the range of competence demanded of attorneys in criminal cases." *Strickland*, 466 U.S. at 687. Because Petitioner fails to satisfy the deficiency prong of *Strickland*, the Court need not address whether he suffered prejudice, though it is relevant to note that Petitioner received a lower sentence than contemplated by the plea agreement due in part to defense counsel's introduction of medical reports which outlined Petitioner's ongoing mental health struggles. For the foregoing reasons, Petitioner has

not demonstrated he suffered ineffective assistance of counsel during sentencing proceedings. Accordingly, the Court **DENIES** his claim.

### A. CERTIFICATE OF APPEALABILITY

A certificate of appealability is authorized "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this standard, Petitioner must show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Petitioner does not have to show "that he should prevail on the merits. He has already failed in that endeavor." *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000) (internal quotation omitted).

Having reviewed the matter, the Court finds that Petitioner has not made a substantial showing that he was denied a constitutional right and the Court is not persuaded that jurists could disagree with the Court's resolution of his claims or that the issues presented deserve encouragement to proceed further. Therefore, a certificate of appealability is **DENIED** .

## II. CONCLUSION

For the foregoing reasons, Petitioner's Motion under section 2255 is **DENIED** without prejudice. Further, the Court **DENIES** a certificate of appealability.

**IT IS SO ORDERED**

Dated: March 7, 2018

Hon. M. James Lorenz
United States District Judge